F I L E D
Clerk
District Court

JUN 01 2015

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 1:13-cr-00002 |
| Plaintiff, | **ORDER DENYING MOTION TO** |
| v. | **DISMISS FOR LACK OF** |
| | **JURISDICTION** |
| **HONG KONG ENTERTAINMENT (OVERSEAS) INVESTMENTS, LTD., dba TINIAN DYNASTY HOTEL & CASINO,** | |
| Defendant. | |

## I.   INTRODUCTION

The Government is prosecuting Hong Kong Entertainment (Overseas) Investments, Ltd. ("HKE"), which operates the Tinian Dynasty Hotel & Casino ("Tinian Dynasty"), for failure to file reports on currency transactions and suspicious activity as required of casinos by the Department of the Treasury. HKE has moved to dismiss the indictment on grounds that it was not obligated to file such reports because Congress has not given Treasury the authority to regulate casinos in the Commonwealth of the Northern Mariana Islands ("CNMI" or "Commonwealth"). Having reviewed all the briefing papers submitted by the parties[1] and considered the arguments of counsel made at a hearing on May 8, 2015, the Court denies the Motion to Dismiss.

## II.   BACKGROUND

### A.   Legislative and Regulatory History

In 1970, Congress passed the Bank Secrecy Act ("BSA"), Pub. L. 91-508, 84 Stat. 1114. The BSA authorized the Secretary of the Treasury to require financial institutions to maintain

---

[1] HKE's Motion to Dismiss Indictment for Lack of Federal Jurisdiction and Failure to State an Offense ("Motion to Dismiss"), ECF No. 73; Government's Combined Opposition to Defendant's Motions to Dismiss and Suppress, ECF No. 84; HKE's Reply (Motion to Dismiss), ECF No. 90; Government's Surreply (Motion to Dismiss), ECF No. 97; HKE's Surreply (Motion to Dismiss), ECF No. 100.

records and make reports of certain types of transactions in order to facilitate criminal and tax investigations. *See Cal. Bankers Ass'n v. Shultz,* 416 U.S. 21, 26 (1974). Criminal penalties attached "only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would impose no penalties on anyone." *Id.* The BSA defined "financial institution" as meaning any of nineteen types of businesses, ranging from banks and insurance companies to pawnbrokers and travel agencies. BSA § 203(e). Casinos were not one of the identified businesses.

In 1984, Treasury proposed to subject casinos to the reporting and record-keeping requirements of the BSA. *See* 49 Fed. Reg. 32861-01. It noted that historically the regulation of gaming industries had been the responsibility of the states, but found that narcotics traffickers were taking advantage of the absence of federal regulation to use casinos to launder money. *Id.* The final rule, promulgated in 1985, brought within Treasury's own regulatory definition of financial institution "[a] casino or gambling casino licensed as a casino or gambling casino by a State or local government and having gross annual gaming revenue in excess of $1,000,000." 50 Fed. Reg. 5065-01. It required casinos to report currency transactions of more than $10,000. *Id.* Treasury located its authority to regulate casinos in two catch-all provisions of the BSA which allow the Secretary to designate as financial institutions other businesses carrying out activities "similar to" those in which listed businesses engage, or showing cash transactions that "have a high degree of usefulness in criminal, tax, or regulatory matters." *See* 60 Fed. Reg. 39665-01 fn. 1 (quoting 31 U.S.C. § 5312(a)(2)(Y) and (Z)).

In 1994, Congress amended the statutory definition of financial institution to codify the application of the BSA to casinos. It adopted language closely tracking that of the Treasury definition, so as to include any casino having in excess of $1 million in annual gaming revenue

2

1   which "is licensed as a casino, gambling casino, or gaming establishment under the laws of any

2   State or any political subdivision of any State[.]" 31 U.S.C. § 5312(a)(2)(X)(i); Money

3   Laundering Suppression Act (1994) § 409, Pub. L. 103-325, 108 Stat. 2160. It also brought into

4   the statutory definition Indian gaming operations conducted under the Indian Gaming Regulatory

5   Act of 1988. 31 U.S.C. § 5312(a)(2)(X)(ii).

6           In 1996, Treasury promulgated a final rule amending the regulatory definition of casino

7   to include casinos "duly licensed or authorized to do business as such in the United States,

8   whether under the laws of a State or of a Territory or Insular Possession of the United States . . ."

9   61 Fed. Reg. 7054-01 (revising 31 C.F.R. § 103.11(n)(7)(i), now 31 C.F.R. § 1010.100(t)(5)(i)).

10  The rule also revised the regulatory definition of "United States" so as to include "the Territories

11  and Insular Possessions," and defined "Territories and Insular Possessions" as including the

12  Virgin Islands, Guam, and the CNMI. 31 C.F.R. § 103.11(nn) and (tt) (now 31 C.F.R. §

13  1010.100(hhh) and (zz)). Treasury noted that "[t]hese definitions are added as required

14  corollaries to the new casino definition." 61 Fed. Reg. 7054-01.

15          B.      Procedural Posture

16          On May 9, 2013, a grand jury indicted HKE and two of the Tinian Dynasty's managers

17  for causing and conspiring to cause a financial institution to fail to file currency transaction

18  reports as required of financial institutions by the BSA. (Indictment, ECF No. 18.) The

19  indictment recites that "[c]asinos qualified as financial institutions within the meaning of the

20  BSA" (count 1 ¶ 2), that casinos are required to file a Currency Transaction Report for Casinos

21  for any transaction involving more than $10,000 in currency (¶ 3), and that the Tinian Dynasty

22  "operated a casino" (¶ 7). The two superseding indictments that the Government subsequently

23  has obtained contain similar recitals. HKE filed its Motion to Dismiss on the same day the grand

24

3

1    jury returned the first superseding indictment (ECF No. 69) and two months before the second

2    (ECF No. 105). At a status conference on January 16, 2015, the parties agreed that nothing in the

3    subsequent indictments mooted the Motion to Dismiss.

### III.    DISCUSSION

5    A.    Arguments of the Parties

6    HKE asserts that it is not subject to Treasury regulation as a casino because it is not

7    "licensed as a casino . . . under the laws of any State or any political subdivision of any State[.]"

8    31 U.S.C. § 5312(a)(X)(i). The Tinian Dynasty casino is licensed under the laws of the CNMI,

9    which is not one of the fifty states. Although the BSA, as amended, defines "United States" to

10   include the Northern Mariana Islands "when the Secretary [of the Treasury] prescribes by

11   regulation," 31 U.S.C. § 5312(a)(6), the statutory definition of casino doesn't use the term "United

12   States." Therefore, says HKE, the term "State," which is not defined, cannot be read to include the

13   CNMI. The attempt by the Treasury Secretary to exert authority over a CNMI-licensed casino by

14   crafting the *regulatory* definition of "financial institution" that reaches casinos "duly licensed . . .

15   as such in the United States," 31 C.F.R. § 1010.100(t)(5)(i), fails because it conflicts with the

16   statutory definition.

17   The Government responds that it is prosecuting the Tinian Dynasty not as a state-licensed

18   casino, directly under the statute, but as a CNMI-licensed casino as prescribed by Treasury

19   regulation. It asserts that the Tinian Dynasty is subject to BSA's reporting requirements for

20   financial institutions under the first catch-all definition of that term, codified at 31 U.S.C. §

21   5312(a)(2)(Y), which allows the Secretary to regulate activities it determines are "similar to,

22   related to, or a substitute for any activity" specifically listed as a financial institution. Alternatively,

23   the Government argues that the power to regulate comes from the second catch-all definition,

24

which permits the Secretary to designate as a financial institution "any other business . . . whose cash transactions have a high degree of usefulness in criminal, tax, or regulatory matters." 31 U.S.C. § 5312(a)(2)(Z). Treasury has so designated CNMI-licensed casinos by expressly defining as a financial institution "[a] casino or gambling casino that: Is duly licensed . . . in the United States, whether under the laws of a State or of a Territory or Insular Possession of the United States," 31 C.F.R. § 1010.100(t)(5)(i), and expressly defining "Territories and Insular Possessions" to include the CNMI. 31 C.F.R. § 1010.100(zz).

B.    Legal Standard

When reviewing an agency's construction of a statute it administers, a court must follow the two-pronged approach established by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). *Garcia-Quintero v. Gonzales,* 455 F.3d 1006, 1011–12 (9th Cir. 2006). "If congressional intent is clear, both the court and the agency must 'give effect to the unambiguously expressed intent of Congress.'" *Id.* at 1012 (quoting *Chevron,* 467 U.S. at 843). If the intent is not clear and Congress has delegated rulemaking authority to the agency, courts must defer to reasonable agency interpretations that are not "arbitrary, capricious, or manifestly contrary to the statute[.]" *Id.* (quoting *Chevron,* 467 U.S. at 844).

C.    Treasury Cannot Regulate CNMI-Licensed Casinos as "Other" or "Similar" Businesses Under 31 U.S.C. § 5312(a)(2)(Y) or (Z)

The Government's argument that Treasury's regulation of CNMI-licensed casinos is a reasonable exercise of its authority to regulate "other" financial institutions "similar to" those listed in the statute is seriously flawed. Casino gambling is not "an activity which is similar to, related to, or a substitute for" an activity listed in § 5312. It *is* one of those activities: casino gambling. Nor is it an "other" business; it is one of *the* listed businesses, a casino. A particular casino may or may not be state-licensed; it may or may not have over $1 million in annual gaming revenue. But

5

that doesn't make the business it runs anything other than a casino business, or the activity that it engages in anything less than casino gambling. When it comes to casino gaming, Congress has determined, in clear and unambiguous language, to limit the reach of the BSA to establishments that are licensed by a state (or state subdivision) and that meet a $1 million revenue threshold. The statutory definition "controls and trumps" the regulatory definition. *Ocampo v. Holder,* 629 F.3d 923, 927 (9th Cir. 2010). Likewise, specific terms of a statute prevail over general ones. *United States v. Wenner,* 351 F.3d 969, 976 (9th Cir. 2003). Treasury cannot expand the definition of "casino" in reliance on either of the catch-alls.

The history of casino regulation under the BSA bears out this conclusion. When "casino" was not among the types of businesses the statute listed as financial institutions, Treasury relied on the catch-all to regulate casinos as a type of business similar to those listed in the statutes. At that time, in the mid-1980s, Treasury was properly exercising agency rulemaking authority to fill a gap explicitly left by Congress. *See Chevron,* 467 U.S. at 843. But once Congress filled the gap, by not only adding casinos to the list but also specifying the kind of casinos to be regulated, Treasury lacked authority to expand that definition. If Treasury has authority to ignore the state licensing requirement, it must also have authority to ignore other restrictions on the casino definition. For example, it could lower the revenue floor to $500,000. Indeed, at the motion hearing, counsel for the Government took that position. When pressed to consider how low Treasury could go, he conceded that dropping it to one single dollar might be too far, although he did not articulate an analytical framework to determine how low was too low. The same problem plagues the Government's licensing argument.

The Government cannot save this prosecution by recasting the question as whether the Tinian Dynasty "is a 'financial institution' within the meaning of Section 5312(a)(2) – not whether

it's a 'casino' within the scope of Section 5312(a)(2)(X)." (Opp'n 15.) To be a financial institution legitimately regulated by Treasury outside the scope of subparagraph (X), the Tinian Dynasty would have to be another type of business or activity than a casino. In its briefings, the Government has shown impatience with HKE's insistence that its casino is different in a legally significant way from casinos in Nevada or New Jersey. And yet the Government's argument is based on a similar but even more confounding move: it requires one to accept that a casino licensed by a state is a different type of business or activity from a casino licensed by the Commonwealth. It is not.

The Government asserts that Ninth Circuit precedent interpreting § 5312 says otherwise. In *United States v. Mouzin,* Barbara Mouzin was charged with currency transaction reporting violations after making large cash deposits for clients that involved exchanging Colombian pesos for dollars. 785 F.2d 682, 686 (9th Cir. 1986). Mouzin claimed that as an individual, she was not a "financial institution," such as a currency exchange, with an obligation to report large cash transactions. *Id.* at 688. Treasury had relied on its power under the statutory catch-all to expand the definition of "financial institution" from commercial enterprises to persons who engaged in activities similar to those of listed enterprises. *Id.* at 689. The court affirmed the validity of the regulatory definition as applied to Mouzin and found that her conduct "qualified her as a 'financial institution' under the [BSA]." *Id.* at 690. It acknowledged that Congress had not given Treasury "unfettered discretion to define those institutions upon which the reporting obligations will fall." *Id.* at 689. In determining that Treasury's expansion of the definition to include individuals was within the Secretary's discretion, the court noted that the text of the statutory definition, prior to a 1976 amendment to eliminate surplusage, had made it clear that a single individual could constitute a financial institution. *Id.* at 689 and n.2. It also observed that Treasury's definition specified that to be subject to reporting duties, a person must be engaged in a covered business and not simply

1    be involved in a one-off transaction. *Id.* at 689–90.

2          The reasoning in *Mouzin* does not compel a similar result here. The Treasury regulation

3    that defined "financial institution" as including "a person who engages as a business in dealing in

4    or exchanging currency," *id.* at 689 (quoting 31 C.F.R § 103.11, now § 1010.100), was compatible

5    with the statutory definition that listed "currency exchange" as a type of business without

6    delimiting the precise meaning of the term. Because Congress had not directly addressed whether

7    individuals engaged in currency exchange can be financial institutions, the court properly deferred

8    to the agency's reasonable interpretation of the statute. In contrast, as to casinos, Treasury was not

9    drawing on a blank slate. Congress expressly limited regulation of casinos to those meeting the $1

10   million revenue threshold which are licensed as casinos "under the laws of any State or any

11   political subdivision of any State[.]" 31 U.S.C. § 5312(a)(2)(X)(i). The "unambiguously expressed

12   intent of Congress," *Chevron,* 467 U.S. at 843, to which the court and Treasury must give effect,

13   is to place only state-licensed casinos under a reporting requirement.

14         The Government also directs the Court's attention to a Fifth Circuit case that upheld the

15   conviction of an individual for failure to report substantial cash transactions. In *United States v.*

16   *Levy* (5th Cir. 1992), a lawyer laundered hundreds of thousands of dollars for drug traffickers

17   through client trust accounts. 969 F.2d 136, 138. The court held that Treasury had not

18   impermissibly expanded the statutory definition when it defined "financial institution" to include

19   a "currency dealer or exchanger." *Id.* at 139–40. The court observed that Congress granted the

20   Treasury Secretary authority to prescribe for other similar businesses and declared, without any

21   further analysis, that the regulatory definition was "well within that grant of authority." *Id.* at 140.

22   This is clearly the right conclusion: currency dealers are engaged in activity similar or related to

23   that of listed businesses such as currency exchanges, investment bankers, and securities brokers.

24

8

However, the cursory analysis in *Levy* adds nothing to the reasoning of *Mouzin,* which involved almost the identical issue.

The Government further relies on *United States v. Goldberg,* 756 F.2d 949 (2d Cir. 1985). Like *Levy, Goldberg* involves individuals charged with failure to report transactions as currency dealers under the regulatory definition of "financial institution." The Second Circuit held that the breadth of the regulatory definition, which included a "person who engages as a business in dealing in . . . currency[,]" 31 C.F.R. § 103.11 (now §1010.100), "reflects Congress's intent . . . to provide a sweeping law enforcement tool for locating . . . large transfers, in currency, of the proceeds of unlawful transaction." *Goldberg,* 756 F.2d at 954. In support of this conclusion, it cited extensively from House Reports and representatives' floor statements affirming their intent to give the Treasury Secretary the broadest authority to reach all types of entities that transfer money. *Id.* at 955–56.

The intent of Congress to delegate sweeping authority to Treasury, in part through the catch-all provisions of the statute, in order to fill gaps in the list of businesses and activities that might emerge as criminal enterprises find innovative means to launder money, is not subject to serious doubt. When it comes to casinos, however, there's no gap to fill. To find that there is would run afoul of the "cardinal principle of statutory construction" to read a statute so that no word is insignificant or superfluous. *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001) (citation and internal quotation marks omitted). The plain language of subparagraph (X), standing alone, narrows the definition of "casino" to casinos "licensed by any State[,]" and the catch-all provisions are not a tool to widen it.

D. Treasury's Regulation of CNMI-Licensed Casinos Is Within Its Express Authority Under the BSA to Regulate Financial Institutions in the Northern Mariana Islands

The statutory definition of "financial institution" does not, however, provide the full

context to appreciate the scope of Treasury authority. Other statutory provisions may also be relevant. In the BSA, as amended, Congress has defined "United States" to mean "the States of the United States, the District of Columbia, and, when the Secretary prescribes by regulation, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, [etc.]." 31 U.S.C. § 5312(a)(6). It has not separately defined the term "State." A basic rule of statutory construction is that an undefined term "is to be construed in accord with its ordinary or natural meaning." *United States v. van den Berg,* 5 F.3d 439, 441 (9th Cir. 1993). Ordinarily, "State" refers to any one of the fifty United States. *See Morse v. Republican Party of Virginia,* 517 U.S. 186, 254 (1996) (Thomas, J., dissenting) (observing that "that word [State] – particularly when capitalized – is generally understood to mean one of the 50 constituent States of the Union.") HKE asserts that because the BSA expressly regulates only casinos "licensed by any State" – not those licensed by any *of the United States* – Treasury's regulation of CNMI-licensed casinos is unauthorized.

"Statutory definitions control the meaning of statutory words . . . in the usual case." *Lawson v. Suwanee Fruit & Steamship Co.,* 336 U.S. 198, 201 (1949). And yet statutory definitions must not be read "in a mechanical fashion" that would "create obvious incongruities in the language, and . . . destroy one of the major purposes" of the legislation. *Id.* Sometimes the "meaning – or ambiguity – of certain words or phrases may only become evident when placed in context." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000). The "overall statutory scheme" must be taken into consideration. *Id.* at 134 (quoting *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989)). The statutory definition of "United States" plainly and unambiguously expresses Congress's intent to give Treasury broad authority to regulate in the CNMI and other territories and insular areas. In this context, Treasury's regulation of CNMI-

1    licensed casinos, as an analog of state-licensed casinos, is reasonable and not arbitrary and

2    capricious.

3            Historical perspective once again illuminates the point. From its inception in 1970, the

4    BSA granted the Treasury Secretary authority to expand the term "United States" to include "the

5    possessions of the United States[.]" BSA § 203(d). In 1986, just a week before the Covenant

6    between the United States and the people of the Northern Mariana Islands came fully into effect,[2]

7    Congress amended the definition expressly to include the Northern Marianas, as well as other

8    U.S. territories and possessions. Pub. L. 99-570 (Oct. 27, 1986) § 1362(b). Prior to 1995, this

9    definition, in conjunction with the subparagraph giving Treasury authority to regulate "similar"

10   businesses, unquestionably would have allowed Treasury to make rules requiring casinos in the

11   CNMI to report large cash transactions. However, in the 1980s there were no casinos in the

12   Commonwealth. The authority for a Commonwealth municipality to grant casino licenses was

13   first established in 1990, after the Tinian Casino Gaming Control Act of 1989 was passed by

14   local initiative. 10 C.M.C. § 2511; *see Commonwealth v. Tinian Casino Gaming Control*

15   *Comm'n,* 3 N.M.I. 134 (1992). Around this same time, casino gaming had just begun to branch

16   out from Nevada to other states, with New Jersey amending its constitution in 1976 to allow

17   casino gambling in Atlantic City. *See Brown v. Hotel and Restaurant Employees and Bartenders*

18   *Int'l Union Local 54,* 468 U.S. 491, 494 (1984). Hence Treasury's first regulation of casino

19   gaming was targeted, understandably, at casinos licensed "by a State or local government." 50

20   Fed. Reg. 5065-01. In the 1994 Money Laundering Suppression Act, Congress clearly modeled

21   the first part of its definition of casino on the Treasury definition. Two years later, Treasury

22

23   _____

24   [2] Covenant to Establish a Commonwealth of the Northern Marianas Islands in Political Union with the
     United States of America ("Covenant"). Proclamation No. 4534, 42 Fed. Reg. 56,593 (Oct. 24, 1977).

1    extended the reach of the BSA again to include the CNMI when it revised the regulatory

2    definitions of "United States" and "Territories and Insular Possessions." 61 Fed. Reg. 7054-01.

3         "It is a 'fundamental canon of statutory construction that the words of a statute must be

4    read in their context and with a view to their place in the overall statutory scheme.'" *Brown &*

5    *Williamson,* 529 U.S. at 133 (quoting *Davis,* 489 U.S. at 809). The Court finds, for the reasons set

6    forth above, that when read in the context of the history of federal casino regulation and the

7    Secretary's express authority under § 5312(a)(6), subparagraph (a)(2)(X) does not preclude

8    Treasury from regulating CNMI-licensed casinos.

9                                    **IV.    CONCLUSION**

10        Because Treasury has been duly authorized by Congress under 31 U.S.C. § 5312(a)(6) to

11   expand the definition of United States to include the CNMI, and because Treasury has in fact

12   promulgated regulations consistent with that authority, it has the authority to enact regulations to

13   prevent money laundering by casinos licensed in the CNMI. Accordingly, Defendant HKE's

14   Motion to Dismiss Indictment for Lack of Federal Jurisdiction and Failure to State an Offense

15   must be DENIED.

16        SO ORDERED this 1st day of June, 2015.

17

18                                    _____
                                      RAMONA V. MANGLONA
19                                    Chief Judge

20

21

22

23

24

                                          12